In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-1183

WATER ISLAND EVENT-DRIVEN FUND, LLC, formerly known as
The Arbitrage Event-Driven Fund, *et al.*,

*Plaintiffs-Appellants*,

*v.*

TRIBUNE MEDIA COMPANY, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18 C 6175 — **Charles P. Kocoras**, *Judge*.

_____

ARGUED SEPTEMBER 16, 2020 — DECIDED JULY 5, 2022

_____

Before EASTERBROOK, MANION, and SCUDDER, *Circuit
Judges*.

EASTERBROOK, *Circuit Judge*. In May 2017 Tribune Media
Company (a broadcast enterprise that had spun off its news-
paper assets in 2014) and Sinclair Broadcasting Group an-
nounced an agreement to merge. In August 2018 Tribune
abandoned the merger and filed suit against Sinclair, accusing
it of failing to comply with its contractual commitment to "use

reasonable best efforts" to satisfy demands of the Antitrust Division of the Department of Justice and the Federal Communications Commission, both of which had authority to block the merger or request the judiciary to stop it. Sinclair settled that suit for $60 million plus the transfer of one broadcast station, though the settlement disclaims liability.

While the merger agreement was in place, many investors bought and sold Tribune's stock. Late in 2017 Tribune's largest investor, Oaktree Capital Management (which at one point held 22% of its stock), sold some shares through Morgan Stanley in a registered public offering. In this class action investors accuse Tribune, Oaktree, Morgan Stanley, and some of their officers and directors, of violating both the Securities Act of 1933 and the Securities Exchange Act of 1934 by failing to disclose that Sinclair was playing hardball with the regulators, increasing the risk that the merger would be stymied.

The Department of Justice wanted Sinclair to divest ten stations in markets where both Tribune and Sinclair operated; Sinclair said no. The Department offered to accept eight stations as sufficient; Sinclair said no. When it feared that the Department would sue, Sinclair finally said yes. But it did not mean by divestiture what the Antitrust Division meant. Sinclair devised transactions that would have left it in practical (though not legal) control of the ten stations by putting them in friendly hands, which would have enabled the sort of coordinated behavior that had concerned the Antitrust Division. When the FCC got wind of those conditions, it started an investigation that threatened to derail the merger indefinitely. At that point Tribune bailed out and sought another partner, finding one in September 2019, when it was acquired by Nexstar Media Group. (Tribune remains in existence as a wholly-

owned subsidiary.) We'll fill in some critical dates later; this outline gives the picture.

The district court dismissed the complaint on the pleadings. 2020 U.S. Dist. LEXIS 1565 (N.D. Ill. Jan. 2, 2020). The principal claims, which rest on the 1934 Act because they concern trading in the aftermarket, all failed, the district court found, under the Private Securities Litigation Reform Act of 1995 (PSLRA or 1995 Act). Questionable statements, such as predictions that the merger was likely to proceed, were forward-looking and shielded from liability because Tribune expressly cautioned investors about the need for regulatory approval and the fact that the merging firms could prove unwilling to do what regulators sought. 15 U.S.C. §78u–5(c)(1). Moreover, the judge observed, all defendants wanted the deal to close, so plaintiffs had not adequately alleged that any omissions occurred with the requisite state of mind. 15 U.S.C. §78u–4(b)(2). See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). The claims under the 1933 Act failed, the judge stated, because Oaktree's secondary offering ended before the first sign that Sinclair was not fulfilling its contractual commitment to use "reasonable best efforts" to satisfy the regulators.

We start with §12 of the 1933 Act, 15 U.S.C. §77*l*(a)(2), which creates liability for any false statement or material omission, regardless of intent, "to the person purchasing such security from him". In this case "him" is Morgan Stanley, which purchased the securities from Oaktree and sold them to the public in a registered offering covered by §11, 15 U.S.C. §77k. (There is an exception to strict liability for certain persons who conduct reasonable investigations. See 15 U.S.C.

§77k(b). Morgan Stanley is not among the persons who can use this due-diligence defense.)

Morgan Stanley contends that none of the plaintiffs purchased securities from it and that none has standing to sue. "Standing" is a bad word for this argument. All plaintiffs allege losses that could be redressed by a favorable judicial decision. Morgan Stanley maintains that they do not satisfy a statutory condition of liability—purchase direct from the underwriter. Failure to satisfy a statutory condition differs from a lack of standing, and the Supreme Court has urged us to avoid using that word in a way that could confuse statutory criteria with the absence of a constitutional case or controversy. *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). So we drop the word "standing" and ask whether the complaint adequately alleges that at least some of the plaintiffs bought from Morgan Stanley.

The answer is yes. Some allegations in the complaint are mealy mouthed—for example, ¶¶ 61 and 62 allege that plaintiffs FNY Partners and FNY Managed Accounts purchased Tribune stock "pursuant or traceable to the Oaktree Offering". There's a legal difference between these possibilities; "traceable to" means in the aftermarket, and thus outside the scope of §12. Why would a securities lawyer tiptoe around the critical issue? But eventually, in ¶229, the complaint alleges that "Morgan Stanley sold Tribune common stock pursuant to Offering Materials directly to Plaintiffs and other members of the class". Exhibits D and E to the complaint show purchases on November 29 and 30, 2017, and December 1, 2017; these dates are within the span during which Morgan Stanley sold the stock it was underwriting. The prices listed in Exhibits D and E do not exactly match Morgan Stanley's offering

price, but sellers don't always get what they ask for. The detail about price does not plead the plaintiffs out of court on their §12 claim.

This is as far as they go under the 1933 Act, however. The registration statement and prospectus through which Morgan Stanley offered these shares stated all of the material facts. Plaintiffs point to what they say is a material omission: Tribune's failure to reveal that Sinclair was playing a dangerous game with the regulators. Yet the Antitrust Division did not propose divestiture of eight to ten stations until November 17, 2017, and Sinclair did not reject that demand until December 15. That was two weeks after plaintiffs say that they purchased shares from Morgan Stanley. Securities law requires honest disclosures but not prescience or mind reading. Cf. *Higginbotham v. Baxter International, Inc.*, 495 F.3d 753, 756, 759 (7th Cir. 2007). Plaintiffs do not allege that Tribune (or Morgan Stanley) knew that Sinclair was preparing to look the lion in the teeth. When Tribune found out, it chided Sinclair for acting inconsistently with its contractual promise to use "reasonable best efforts" to obtain necessary regulatory clearances. It is impossible to rest any liability on the 1933 Act.

Plaintiffs' main problem under the 1934 Act, as amended by the 1995 Act, is that statements about prospects for the merger's success were forward-looking. (Plaintiffs do not allege that Tribune misstated any matter of historical fact.) The press releases, proxy materials, and other statements issued in connection with the proposed merger, plus the quarterly reports filed before the merger was abandoned, all correctly stated the terms of the deal, including Sinclair's promise to use "reasonable best efforts" to win approval. Plaintiffs don't view Sinclair's efforts as reasonable (nor did Tribune, in the

end), but a term such as "reasonable" may mean different things to different people, and it is hard to describe as "fraud" *by Tribune* the fact that Sinclair saw its obligation differently from Tribune's understanding. And, as the district court stressed, Tribune alerted investors repeatedly to potential problems. Here are some of the cautions:

- [I]t cannot be certain when or if the conditions for the Merger will be satisfied or waived;

- The Merger is subject to a number of conditions, including conditions that may not be satisfied or completed on a timely basis, if at all;

- There can be no assurance that the actions Sinclair is required to take under the Merger Agreement to obtain the governmental approvals and consents necessary to complete the Merger will be sufficient to obtain such approvals and consents or that the divestitures contemplated by the Merger Agreement to obtain necessary governmental approvals and consents will be completed; and

- Failure to obtain the necessary governmental approvals and consents would prevent the parties from consummating the proposed Merger.

These cautions satisfy the requirements of the 1995 Act's safe harbor. That concessions would be demanded, and that too much would be too much, was disclosed (and outsiders had to know anyway). Likewise investors surely knew that bluffing in negotiations is normal, and Tribune could not reveal, as if they were facts, beliefs about how far Sinclair would push the regulators and whether the Antitrust Division or the FCC would call any bluff.

As time went on, Tribune became gloomier about whether
Sinclair would do enough to satisfy the regulators. Let us sup-
pose that, after Tribune reached this conclusion (recall that in
December 2017 it accused Sinclair of not doing enough), the
cautions about contingencies were no longer enough to meet
the requirements of the safe harbor. Still, during the negotia-
tions Sinclair assured Tribune that it would keep its promise,
which makes it hard to say that Tribune acted with intent to
defraud when it didn't disclose that Sinclair was balky. There
was at most a dispute, not certainty, about compliance ("rea-
sonable" is a term hard to pin down)—and Tribune's execu-
tives were not privy to the thinking of Sinclair's executives.

The complaint does not tell us when, if at all, Tribune
learned about the "entanglements" (the parties' word for the
conditions on divestiture) that led to the merger's demise; the
complaint is not specific about either dates or details. At all
events, plaintiffs do not deny that Tribune wanted the merger
to close; no one there had anything to gain by its failure,
which would diminish the price of management's stock (and
Oaktree's remaining holdings) as surely as it would injure
outside investors. *Tellabs* says that defendants are entitled to
judgment on the pleadings unless the allegations show that
intent to defraud is at least as likely as the absence of bad in-
tent. Like the district court, we think that this complaint's al-
legations fall short.

Indeed, plaintiffs' complaint lacks any information about
the time that Tribune learned things, in relation to the public
statements that Tribune made, which makes it impossible to
see how Tribune could have had fraudulent intent on the
dates it made statements. Tribune says that the entanglements
came to its knowledge only after all of the contested public

statements; if that is so, there isn't even a colorable argument for fraudulent intent. That leaves only the high-level-of-generality arguments about nondisclosure of Sinclair's negotiating posture, which are not enough to show bad intent.

Two additional points are worth making.

Plaintiffs suppose that, during a major corporate transaction, managers' thoughts must be an open book. Nothing in the 1934 Act or any of the SEC's regulations requires this. See *Livonia Employees' Retirement System v. Boeing Co.*, 711 F.3d 754, 758–59 (7th Cir. 2013). To the contrary, secrecy can be valuable. Suppose Tribune's managers knew Sinclair's full strategy and exactly how far it would go to satisfy regulators—in economic terms, Sinclair's reservation price. Nothing in the complaint implies that it did (Sinclair's negotiators were not inept), but suppose. Could investors have gained by disclosure? Hardly; revelation of the reservation price would have enabled the Antitrust Division and the FCC to squeeze harder, potentially making the merger unprofitable to both Tribune and Sinclair—and, if expected profits decline, so does the stock price, to investors' detriment. Keeping Sinclair's strategy confidential strengthened the potential merging partners' hand in negotiations with regulators. It would be unwarranted to read the securities laws as requiring businesses to surrender that advantage when negotiating with the government.

Next consider Sinclair's effort to produce the outward signs of divestiture (separate legal ownership) while retaining practical control, which led the FCC to take steps that doomed the merger. Would Tribune, had it known that information earlier, have thought that concealing it from investors would injure them? We ask the question this way because bad intent

is essential to liability under the 1934 Act, as amended by the 1995 Act. Contrast *Basic Inc. v. Levinson*, 485 U.S. 224, 234–35 (1988), a pre-PSLRA decision saying that the benefits of secrecy during merger negotiations do not justify fraud. *Basic* did not discuss the requirements for pleading *scienter*.

We doubt that Tribune would have understood news about Sinclair's contemplated entanglements as adverse to investors. Recall why the Antitrust Division wanted divestiture: a merged firm holding multiple broadcast assets in a given area obtains some market power and could raise prices. That would work to the detriment of advertisers (the customers for over-the-air broadcasting) but to the benefit of investors in the merged firm. Trying to put one over on regulators is a dangerous game, and once the FCC caught on the merger was cooked, but if Sinclair's gambit had succeeded investors would have been the winners. (By this we mean investors in the merged firm; investors in advertisers, and the economy as a whole, would have been worse off as a result of monopoly pricing.) It is hard to see an intent to harm Tribune's investors in thinking that the gambit was worth the risk. With the benefit of hindsight, we know that Sinclair failed. But as Judge Friendly observed long ago, there is no "fraud by hindsight." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). See also *Murray v. ABT Associates*, 18 F.3d 1376, 1379 (7th Cir. 1994).

Remaining disputes, such as loss causation and the derivative liability of corporate insiders, need not be addressed.

AFFIRMED