# United States Court of Appeals
## For the First Circuit

No. 25-1192

PREMCA EXTRA INCOME FUND LP, individually
and on behalf of all others similarly situated,

Plaintiff, Appellant,

DYLAN DAS,

Plaintiff,

v.

COLIN M. ANGLE; JULIE ZEILER,

Defendants, Appellees,

IROBOT CORPORATION,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Rikelman, Lynch, and Aframe,
Circuit Judges.

Christopher P. T. Tourek, with whom Joshua B. Silverman, Genc
Arifi, and Pomerantz LLP were on brief, for appellant.
Alisha Q. Nanda, with whom James R. Carroll, Rene H. DuBois,
and Skadden, Arps, Slate, Meagher & Flom LLP were on brief, for
appellees.

June 5, 2026

**AFRAME**, **Circuit Judge**.  In August 2022, Amazon, Inc., the online retailer, and iRobot, Inc., a robotics company best known for inventing a popular robot vacuum cleaner called the Roomba, announced their intention to merge.  Over the next approximately eighteen months, Amazon and iRobot sought clearance for the merger from domestic and international antitrust regulators.  In January 2024, when approval from United States and European Union authorities seemed doubtful, Amazon and iRobot terminated their merger attempt.

Following the abandoned merger, iRobot shareholders, led by Premca Extra Income Fund, LP ("Premca"), brought a securities fraud class action against iRobot, Colin Angle, iRobot's chief executive officer, and Julie Zeiler, iRobot's chief financial officer.  After Premca filed an amended complaint, the defendants moved to dismiss it for failing to state a claim, arguing that it neither identified a statement that contained an actionable material misrepresentation or omission nor adequately alleged scienter.  The district court agreed on both fronts and dismissed the complaint with prejudice.  Premca appealed.  After oral argument, iRobot entered Chapter 11 bankruptcy, which resulted in a temporary stay of the appeal.  During the stay, the parties jointly requested to dismiss iRobot from the appeal but to have the appeal proceed with respect to Angle and Zeiler (the "individual defendants").  We granted that request.

We now conclude that the district court correctly dismissed the amended complaint for all statements identified by Premca except for the August 24, 2023, modified proxy statement. As we explain, the amended complaint plausibly alleges that an opinion expressed in iRobot's modified proxy statement -- namely, that the company expected regulatory approval for the merger -- is actionable because it omitted important contrary information about European approval in circumstances that adequately suggest scienter.

**I.**

Because we are evaluating the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we describe the well-pleaded allegations from the amended complaint, supplemented by "'documents the authenticity of which are not disputed by the parties,' 'official public records,' and 'documents sufficiently referred to in the complaint.'" Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 4 (1st Cir. 2021) (quoting Mehta v. Ocular Therapeutix, Inc., 955 F.3d 194, 198 (1st Cir. 2020)).

We start with some background on the primary antitrust authorities involved, namely, the European Commission ("EC") in the European Union and the Federal Trade Commission ("FTC") in the United States. We then turn to the details of the merger and the travel of the case.

## A.    Regulatory Background

In the European Union, the EC reviews mergers that exceed certain revenue thresholds, including the merger at issue here.  Parties proposing a covered merger must formally notify the EC of the transaction, and often, there are pre-notification communications between the EC and the merging parties.  After formal notification, the EC has twenty-five working days to conduct a Phase I review.  During that review, the EC will obtain information from the merging companies, communicate with them, and hold a "state-of-play meeting" to disclose the investigation results.  Following Phase I, the EC will either (1) "clear[]" the merger -- unconditionally or subject to accepted remedies -- or (2) open a Phase II investigation.

The EC will launch a Phase II investigation if it has concerns about the merger's anticompetitive effect on the European market.  A Phase II investigation lasts ninety working days, but the EC may extend it.  If, following Phase II, the EC concludes that the proposed merger will impede competition, it will send the parties a statement of objections.  The parties may then respond to the objections, review the EC's file, and request an oral hearing before an independent hearing officer.  In 2022, 2.1% of mergers proposed to the EC entered Phase II.

In the United States, merging companies involved in transactions of a certain size must file a pre-merger

notification, which either the FTC or the Department of Justice's Antitrust Division reviews. See 15 U.S.C. § 18a(a), (b)(1)(A). The FTC reviewed the merger at issue here, and thus we focus on the statutory requirements as applicable to that agency. The pre-merger notification triggers a thirty-day waiting period while the FTC conducts its review. See id. § 18a(b)(1)(B). If, during the waiting period, the FTC decides that it needs more information, it may make a so-called second request for information. See id. § 18a(e). The FTC may approve the merger or sue to block it because of its anticompetitive effects. See id. § 18a(f). Throughout the process, the FTC will continue to engage with the merging parties. In 2022, the FTC issued a second request for information in less than one percent of the mergers it reviewed.

Finally, we note that the United Kingdom's Competition and Markets Authority ("CMA") also reviewed this merger. Its review, however, is only tangential to this case and so we do not provide further details on its regulatory processes.

B.    **iRobot and Amazon's Merger Attempt**

iRobot was founded in 1990 by Angle and two colleagues. Initially, iRobot built robots mostly for the military, but by the early 2000s, the company shifted its focus to consumer products. Its primary product is the Roomba, the well-known robot home vacuum that can sense dirt on its own. Despite initial

success, iRobot's market share began to decrease in 2014 as new competitors entered the market. After a brief bump in sales during the COVID-19 pandemic, iRobot's earnings continued to decline.

In May 2022, Amazon contacted iRobot about a potential acquisition. A couple months later, Amazon and iRobot agreed that Amazon would pay sixty-one dollars per share to acquire iRobot. The parties also agreed that Angle would continue as iRobot's CEO after the merger. As part of the agreement, the companies committed to provide each other with "prompt notice" of "any request or proceeding by or before any Governmental Authority with respect to the" merger; use "reasonable best efforts" to obtain regulatory clearance and resolve regulatory objections; "supply as promptly as reasonably practicable" additional information requested or required by regulators; and contest any proceedings challenging the merger. On August 5, 2022, the companies announced their merger agreement. Shortly after the merger announcement, Amazon and iRobot began holding integration meetings for nine separate work streams, including real estate and finance.

In early September 2022, the FTC began its investigation of the merger. Shortly thereafter, iRobot filed with the Securities and Exchange Commission ("SEC") its original proxy statement for the transaction. In that document, iRobot predicted that "all applicable regulatory approvals [would] be obtained"

but acknowledged that the merger "[could not] be consummated" until such approvals were granted.[1]

After filing its initial proxy statement, iRobot began to face additional regulatory scrutiny. On September 19, 2022, the FTC, following its initial merger review, sent the parties a second request for information about the transaction. And in early 2023, the EC also intensified its scrutiny of the merger. According to a February 15, 2023, *Financial Times* article, the EC

---

[1] In the same document, iRobot also provided what would become a typical risk disclosure:

> Although Amazon.com and iRobot believe that the merger will not violate the antitrust or foreign investment laws and expect that all required regulatory clearances and approvals will be obtained, Amazon.com and iRobot cannot assure that these regulatory clearances and approvals will be timely obtained, obtained at all or that the granting of these regulatory clearances and approvals will not involve the imposition of additional conditions, restrictions, qualifications, requirements or limitations on the completion of the merger, including the requirement to divest assets, license or hold separate assets or terminate existing relationships and contractual rights, or agree to other remedies, or require changes to the terms of the Merger Agreement, or that a challenge to the merger on antitrust or foreign investment grounds will not be made, or if such challenge is made, what the result will be. These conditions or changes could result in the conditions to the merger not being satisfied. There is currently no way to predict how long it will take to obtain all of the required regulatory approvals or whether such approvals will ultimately be obtained . . ..

- 8 -

sent Amazon a series of detailed questions about the merger before the parties had formally notified the EC of the merger. The article explained that the EC's questions arose from an investigation appearing in the *MIT Technology Review* that claimed the Roomba could capture intimate images of people in proximity to the product.

About a month later, in March 2023, there were rumblings that Amazon was resisting some regulatory requests. *Politico* reported that Amazon had been "largely unresponsive to the FTC's investigation" and refused "to turn over information requested by the FTC." Similarly, iRobot learned internally that Amazon was not providing the EC with all the information that it had requested. According to confidential witness 2 ("CW2") -- who was iRobot's senior tax manager for global finance from June 2017 to December 2023 and then the director of global finance -- in May 2023, senior leadership, including the individual defendants and iRobot's chief legal officer, Glen Weinstein, gathered for a meeting.[2] There, per CW2, Weinstein announced that the EC had asked Amazon for information about its search engine because of concerns that Amazon would boost its own products at competitors'

---

[2] Confidential witness 1 ("CW1") was a director-level officer at iRobot between November 2021 and April 2024 who reported on certain aspects of iRobot's business practices after the merger agreement was signed. CW1's allegations do not bear on this appeal.

expense.  According to Weinstein, Amazon had refused to comply with the EC's request.

On May 9, 2023, iRobot filed a Form 10-Q.  In that filing, iRobot acknowledged that it and Amazon had received from the FTC a second request for information related to the merger. The filing also indicated that iRobot "and Amazon [were] continu[ing] to work cooperatively with the FTC staff in its review of the [m]erger."

On June 1, 2023, iRobot and Amazon filed their formal notification of the merger with the EC, and shortly thereafter, the EC initiated a Phase I review.  About two weeks later, the United Kingdom's CMA approved the merger.  *Reuters* reported the approval and quoted Angle as stating that iRobot and Amazon continued "to work cooperatively with other relevant regulators in their review of the merger."

On July 6, 2023, the EC issued a press release announcing that it was pursuing a Phase II investigation. Explaining this decision, the EC press release stated that it was "concerned that the transaction would allow Amazon to restrict competition in the market for robot vacuum cleaners . . . and to strengthen its position as [an] online marketplace provider."  In particular, the press release cited a preliminary finding that:

> Amazon may have the ability and the incentive
> to foreclose iRobot's rivals by preventing
> them from selling [robot vacuum cleaners] on

Amazon's online marketplace and/or by degrading their access to [the marketplace] . . .. This may include: . . . favouring iRobot's [robot vacuum cleaner] in both non-paid (i.e., organic) and paid results (i.e., advertisements) displayed in Amazon's marketplace . . .. Such foreclosure strategies could restrict competition in the market for the manufacturing and supply of [robot vacuum cleaners], leading to higher prices, lower quality, and less innovation for consumers. (emphasis omitted)

The release also noted that "[t]he vast majority of . . . mergers [presented to the EC] do not pose competition problems and are cleared after a routine review." At the end of the section detailing the EC's competition concerns, the release explained that "[t]he opening of an in-depth inquiry does not prejudge the outcome of the investigation."

Later that month, iRobot announced that it had secured a $200 million loan for ongoing operations. The next day, iRobot and Amazon issued a joint press release announcing a reduction in the per share purchase price that Amazon would pay to acquire iRobot. The release stated that completion of the merger was subject to "regulatory approvals" and "approval of the amended merger agreement by iRobot's stockholders." It also stated that "Amazon and iRobot [were] working cooperatively with the relevant regulators in their review of the merger."

In early August 2023, three significant events occurred around the same time. First, according to CW2, the companies

- 11 -

ceased holding real estate integration meetings. Second, confidential witness 3 ("CW3"), a "[d]irector-level employee" from April 2021 to May 2024 whose job responsibilities included overseeing the company's "user experience and software design," similarly reported that iRobot's software engineering department had stopped working on all integration matters with Amazon. Third, CW3 attended a senior leadership meeting with the individual defendants. There, per CW3, Weinstein, the chief legal officer, announced that the EC had requested information related to Amazon's search engine -- specifically, information regarding whether the engine was favoring Amazon's internal products to the detriment of competition -- and that Amazon had refused this request.

Then, on August 8, 2023, iRobot filed a Form 10-Q with the SEC, which included updates on the merger's regulatory status. That filing disclosed the second request for information from the FTC in September 2022; the approval by the CMA in June 2023; and the EC's announcement of the Phase II investigation in July 2023. The Form 10-Q provided standard warnings that the merger might not obtain regulatory approvals. It made no predictions about the likelihood of obtaining the needed approvals.

On August 24, 2023, iRobot filed with the SEC its modified merger proxy statement, which Angle signed. For the first time since filing the original proxy statement in early

September 2022, iRobot stated that it and Amazon "expect[ed] that all applicable regulatory approvals [would] be obtained" and "believe[d] that the merger [would] not violate the antitrust or foreign investment laws." The statement also contained the same caveats and risks that were included in the original September 2022 proxy statement. The modified proxy statement did not include a description of the anticompetitive concerns expressed by the EC in its press release announcing the Phase II investigation. Nor did it explain that Amazon had recently refused to provide information about its search engine related to the EC's competition concerns.

According to CW2, in September 2023, iRobot executives held discussions about plans for the company to proceed without merging. Further, confidential witness 4, a senior project manager at iRobot from June 2020 to May 2024, reported that by October 2023, all integration meetings between iRobot and Amazon had stopped. On October 12, 2023, iRobot's shareholders voted in favor of the merger.

On November 7, 2023, iRobot filed another Form 10-Q with the SEC. That filing provided an update on the status of the regulatory reviews, including that the EC had extended the Phase II deadline to February 14, 2024. This Form 10-Q continued to warn investors that the merger might not obtain regulatory approval. But unlike the modified proxy statement published on

- 13 -

August 24, the filing included no statement that iRobot expected that all applicable regulatory approvals would be obtained.

On November 27, 2023, the EC issued a statement of objections to the merger. The statement expressed concern that Amazon might inhibit competition by "preventing rivals from selling [robot vacuum cleaners] on Amazon's online marketplace." That same day, iRobot filed a Form 8-K with the SEC reporting the EC's statement of objections. The document described the purpose of a statement of objections and stated that the companies would be allowed "to present arguments in response to the [EC's] preliminary assessment." iRobot again offered no prediction on how the EC was likely to resolve the matter and stated that the company faced a risk that the merger would not be "consummate[d] . . . in a timely manner or at all."

In December 2023, it became public knowledge that Amazon would defend the merger at a closed EC hearing later that month. On January 10, 2024, a *Politico* article reported that Amazon did not offer concessions at the hearing to try to gain the EC's approval. Nevertheless, the article quoted Angle as stating that iRobot was "continu[ing] to work cooperatively with the [EC]" and that the company "remain[ed] excited about the opportunity to work together with Amazon." About a week later, the *Wall Street Journal* reported that the EC intended to block the merger. The next day,

*Bloomberg* reported that the FTC was drafting a lawsuit to do the same.

On January 29, 2024, Amazon and iRobot issued a joint press release announcing that the parties had entered into a mutual agreement to terminate the merger. Pursuant to that agreement, iRobot received a ninety-four-million-dollar termination fee from Amazon. That same day, the company announced layoff plans and that Angle had stepped down as CEO.

## C.    Procedural History

A couple months later, Premca filed this suit against iRobot and the individual defendants on behalf of a putative class of iRobot investors. Premca's amended complaint seeks recovery against all defendants under § 10(b) of the Securities and Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, which was promulgated pursuant to the Act. The amended complaint also includes a claim against the individual defendants as "controlling persons" under § 20(a) of the Act. 15 U.S.C. § 78t.[3] The amended complaint essentially alleges that during the class period -- February 13, 2023, through January 29, 2024 -- the defendants made numerous misleading

---

[3] The amended complaint also alleges a claim against iRobot and Angle under § 14(a) of the Security and Exchanges Act, 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9, which was promulgated pursuant to that Act. The district court dismissed this claim and Premca does not pursue it on appeal.

- 15 -

statements and omitted material information regarding Amazon's cooperation with regulators and the status of the regulatory approval process.

The defendants moved to dismiss the action based on the heightened pleading standards supplied by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See 15 U.S.C. §§ 78u-4, 78u-5. The district court granted the motion on the § 10(b) claim, concluding that the amended complaint contained insufficient factual support for the fraud allegations and inadequate allegations of scienter. The court then dismissed the § 20(a) claim because it was derivative of the § 10(b) claim. Premca timely appealed. Following iRobot's bankruptcy, this appeal proceeds only as to the individual defendants. Supra at slip op. 3.

## II.

We review de novo the grant of a motion to dismiss. Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002). A complaint for securities fraud survives a motion to dismiss so long as it states a claim that is plausible on its face, pleads with particularity the circumstances constituting fraud, see Fed. R. Civ. P. 9(b), and satisfies the heightened pleading requirements of the PSLRA. State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc., 152 F.4th 1, 9 (1st Cir. 2025).

- 16 -

The parties agree that Premca's § 20(a) claim rises and falls with its § 10(b) claim. See Carbonite, 22 F.4th at 6. Thus, we focus our analysis on the § 10(b) claim. A plausible § 10(b) claim requires well-pleaded allegations of: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." Id. (quoting In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017)). Here, iRobot challenges Premca's showing on the first two elements.

In cases involving a § 10(b) claim, a complaint must survive the heightened pleading standards established by Rule 9(b) and the PSLRA. See Charles River, 152 F.4th at 9. These heightened standards affect both challenged elements here -- a complaint must allege a misleading statement or omission with heightened particularity and scienter with both heightened particularity and plausibility. See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63 F.4th 747, 766 (9th Cir. 2023).

With respect to the misleading statement or omission, Rule 9(b) requires a plaintiff to "state with particularity" the allegations "constituting the fraud." Fed. R. Civ. P. 9(b). And the PSLRA requires the complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); see Mehta, 955 F.3d at 206.

- 17 -

As for scienter, the PSLRA requires a complaint to allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To "qualify as 'strong[,]' . . . an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314 (2007).

## III.

We start our discussion by addressing a threshold question about which aspects of the amended complaint constitute well-pleaded allegations. Specifically, the parties disagree about whether allegations from CW2 and CW3 related to certain senior leadership meetings so qualify. Next, we turn to whether any of the statements that Premca identifies supports a plausible § 10(b) claim.

### A.  The Confidential Witness Allegations

In its amended complaint, Premca relies heavily on information provided by CW2 and CW3 regarding Weinstein's statements at senior leadership meetings. The individual defendants argue that we should ignore these allegations because they are inadequately pleaded allegations from confidential sources. We disagree.

- 18 -

In a securities fraud case, information from confidential sources may, consistent with the PSLRA, constitute well-pleaded allegations. See In re Cabletron Sys., Inc., 311 F.3d 11, 28-30 (1st Cir. 2002). In ruling on a motion to dismiss, a court may consider allegations from a confidential source when those allegations indicate "both that the source had access to information and that the information has the earmarks of credibility." N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 52 (1st Cir. 2008).

Overall, we take "a hard look" at information from confidential sources "to evaluate [its] worth." Biogen IDEC, 537 F.3d at 51. In doing so, we apply a "totality of the circumstances" approach. In re Cabletron Sys., 311 F.3d at 30 (quoting United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997)). This approach requires us to evaluate, inter alia, "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." Id. at 29-30. No single factor "is dispositive." Id. at 30. Applying this framework, the amended complaint contains sufficient information to credit CW2 and CW3's information about iRobot's senior leadership meetings.

First, the allegations are both plausible and coherent. The amended complaint identifies CW2 as the director of global finance, who reported directly to Zeiler. Further, it describes CW2 as the finance lead for mergers and acquisitions and states that starting in 2023, CW2 was substantially involved in managing iRobot's real estate holdings.[4] In a similar vein, the amended complaint states that CW3 worked from April 2021 to May 2024 as a "[d]irector-level employee" whose job responsibilities included overseeing the company's "user experience and software design." The amended complaint thus alleges that both CWs served in specific management positions at iRobot.

The individual defendants assert that it is implausible that managerial employees would be included in senior-level meetings where the chief legal officer announced information about the pending merger. But there is no obvious reason why these managerial employees would be excluded from such meetings. Moreover, the CW allegations are based on the witnesses' "personal knowledge" from their own participation in these meetings. In re Cabletron Sys., 311 F.3d at 30.

---

[4] The individual defendants contend that CW2's information is not credible because, as a director of global finance, CW2 would not have had responsibility for iRobot's real estate holdings. We do not understand, however, why it is implausible for an iRobot executive involved in global finance to have an expansive portfolio that could involve real estate. To the extent this is of concern, it is better left for discovery.

- 20 -

Second, CW2 and CW3's descriptions of the leadership meetings are corroborated by one another, along with other sources.[5] Both CWs reported that these meetings, held mere months apart, were attended by the chief legal officer and the individual defendants. Moreover, they both alleged that the chief legal officer provided similar merger updates about Amazon's refusal to provide information about its search engine to the EC.[6] Non-CW sources also corroborate CW2 and CW3's descriptions of the senior leadership meeting. *Politico* reported that Amazon declined to provide information to the FTC in March 2023 and stated that Amazon would not "offer concessions" to the EC to assuage its concerns. Further, when the EC initiated the Phase II investigation, it issued a press release acknowledging that it was concerned about Amazon's ability to leverage its own online marketplace to the disadvantage of iRobot's competitors.[7]

---

[5] The CWs also corroborated each other about the cessation of integration meetings with Amazon. CW2 reported the close of real estate integration meetings near in time to when CW3 reported the close of integration meetings involving the software engineering department.

[6] To contest this point, the individual defendants point out that the May 2023 meeting described by CW2 occurred before the EC had begun its Phase I investigation. But the amended complaint alleges that the EC engaged in pre-investigation contacts with the merging parties. Thus, it is plausible that the EC requested information from Amazon about the search engine before the merging parties issued the formal notice triggering the Phase I investigation.

[7] The individual defendants argue that we should not view the March 2023 *Politico* article as corroborating the senior

The individual defendants' main objection to crediting CW2 and CW3's allegations about the senior leadership meetings is that these CWs did not provide any information confirming that Amazon did not cooperate with the EC's merger review. Building from this premise, the individual defendants contend that the CW allegations lack sufficient detail to support an inference that iRobot falsely stated that Amazon was cooperating with regulators. Again, we disagree.

Information from confidential sources may be considered so long as there are allegations suggesting that the confidential source would have had access to the information described and that the information provided is credible. See Biogen IDEC, 537 F.3d

_____

leadership meetings because the article involved the FTC while the senior leadership meetings pertained to the EC. The individual defendants further argue that the March 2023 *Politico* article should not be credited because it relies on anonymous sources. These arguments are unconvincing.

First, we think it irrelevant for these purposes that the article addressed the FTC as opposed to the EC. The article describes Amazon's conduct toward antitrust regulators that is consistent with the conduct reported in the senior leadership meetings. Second, the individual defendants do not challenge the January 2024 *Politico* article, which addresses Amazon's conduct with the EC. While this second article was published several months after the senior leadership meetings, it describes substantively identical conduct to that reported by CW2 and CW3 and thus corroborates their statements. Finally, we are unmoved by the individual defendants' attempt to paint these articles as unreliable. Considering the totality of facts surrounding these articles -- including that they were published in a reputable media source and were corroborated by CW statements -- we believe that they are reliable under the PSLRA and Rule 9(b).

at 52. In this regard, the amended complaint provides enough detail about CW2 and CW3 to provide a plausible basis for why they would attend the senior leadership meetings. It further provides sufficient detail to credit their accounts of what Weinstein said at those meetings. The individual defendants have provided no sound basis for discounting the CW statements.

To the extent the individual defendants claim that the confidential sources' information should be discounted because the information the sources provide does not, by itself, show fraud, they are wrong. See Biogen IDEC, 537 F.3d at 52. Instead, we regularly consider CW information in conjunction with other allegations in the amended complaint to assess the adequacy of the claim. See, e.g., In re Cabletron Sys., 311 F.3d at 28-31. With that in mind, we turn to whether the allegations about these meetings combined with other well-pleaded allegations establish a plausible § 10(b) claim.

**B.    The § 10(b) Claim**

Premca's § 10(b) claim focuses on two sets of iRobot's statements: (1) those indicating that Amazon was cooperating with regulators in their evaluation of the merger, and (2) those providing status updates on the merger-review process. Generally, iRobot issued statements in the first category before the August 24, 2023, modified proxy statement, while statements in the second category came on or after that date. Because a statement or

omission "must have been misleading at the time it was made," we proceed with our analysis chronologically. <u>Handal</u> v. <u>Innovative Indus. Props., Inc.</u>, 157 F.4th 279, 293 (3d Cir. 2025) (quoting <u>In re NAHC, Inc. Sec. Litig.</u>, 306 F.3d 1314, 1330 (3d Cir. 2002)); <u>see also</u> <u>id.</u> (observing that "liability cannot be imposed on the basis of subsequent events" (quoting <u>In re NAHC</u>, 306 F.3d at 1330)).  We start with the pre-August 24, 2023, statements and end with the post-August 24, 2023, statements, all of which fail to establish a basis for a plausible claim.  In between discussing the failed statements from these two periods, we address the August 24, 2023, modified proxy statement, which is the only statement that presents a plausible claim under § 10(b).[8]

### 1.  The Pre-August 24, 2023, Allegations

Premca alleges, between the start of the class period on February 13, 2023, and August 24, 2023, that iRobot made three misrepresentations about cooperation between Amazon and regulators:

> <u>May 9, 2023, 10-Q statement</u>: iRobot "and Amazon continue to work <u>cooperatively</u> with

---

[8]  That certain statements may not themselves be actionable does not necessarily mean that they are inadmissible as evidence of scienter, an issue to be determined by the district court on remand.  <u>Cf. In re Cabletron Sys., Inc.</u>, 311 F.3d 11, 36-37 (1st Cir. 2002) (finding certain statements alleged to be misleading by omitting "adverse factors" were not actionable, but that, on remand, those adverse factors could "help support scienter" and "be considered" "[a]s the rationale for the other fraudulent actions" alleged).

the FTC staff in its review of the [m]erger."
(Emphasis added).

<u>June 16, 2023, quote by Angle in a *Reuters*
article</u>: "[B]oth companies are continuing to
work <u>cooperatively</u> with other relevant
regulators in their review of the merger[.]"
(Emphasis added) (last alteration in the
original).

<u>July 25, 2023, joint press release</u>: "Amazon
and iRobot are working <u>cooperatively</u> with the
relevant regulators in their review of the
merger." (Emphasis added).

Premca argues that despite these public assertions of cooperation, Amazon had, at certain points, not yet met regulators' requests for information about its search engine. In making its argument, Premca contends that we should examine the whole sweep of its amended complaint to determine whether these statements support a plausible claim under § 10(b). It suggests that if we do so, we would see a "persistent series of refusals" to cooperate with regulators by Amazon. And based on this narrative, we would further conclude that the individual defendants misled investors with the requisite scienter every time iRobot announced Amazon's continued cooperation with regulators.

Our analysis, however, does not unfold in such a gauzy manner. Rather, we proceed "statement by statement." <u>Zhou</u> v. <u>Desktop Metal, Inc.</u>, 120 F.4th 278, 293 (1st Cir. 2024). In doing so, "we evaluate the immediate context of each statement -- namely, the balance of what was said on the

- 25 -

particular occasion, and the immediate circumstances in which the particular statement was made." Id. (citation modified).

Under such an analysis, the amended complaint sets forth only a handful of allegations that cast doubt on the pre-August 24, 2023, challenged statements pertaining to cooperation. The first relates to the FTC's merger review and is found in a March 2023 *Politico* article. That article describes a series of ongoing FTC investigations related to Amazon, including the iRobot merger. It states that Amazon had been "largely unresponsive to the FTC's investigation" of the iRobot merger and had "refus[ed] to turn over information requested by the FTC." It also includes a statement from an Amazon spokesperson that the company was "working cooperatively with the relevant regulators in their review of the merger." The article contains no official comment from a regulatory agency asserting Amazon's lack of cooperation. And it also does not allege that Amazon was entirely stonewalling regulators in the review process.

The next set of statements relates to the EC review. The amended complaint references a February 15, 2023, *Financial Times* article stating that the EC sent Amazon "a series of detailed questions over the proposed transaction," though the article does not report that Amazon refused to respond to these questions. The amended complaint then refers to the May 2023 meeting where the chief legal officer announced to iRobot's senior leadership that

the EC had "asked Amazon for information on how its search engine worked . . . and Amazon steadfastly refused to cooperate with regulators' requests."

Assuming (with some skepticism) that the pre-August 2023 challenged statements were materially false or misrepresentative, we agree with the district court that they do not give rise to a strong inference of scienter and thus do not plausibly state a § 10(b) claim. See Biogen IDEC, 537 F.3d at 47, 57 (affirming dismissal on scienter grounds after assuming a misleading statement). Scienter under the PSLRA is "a mental state embracing intent to deceive, manipulate, or defraud." Aldridge, 284 F.3d at 82 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)). For a complaint to state a plausible claim of scienter, the plaintiff "must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Id. "Recklessness, as used in this context, does not include ordinary negligence, but is closer to being a lesser form of intent." In re Biogen Inc. Sec. Litig., 857 F.3d at 41 (internal quotation marks omitted) (quoting Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 240 (1st Cir. 2015)). As detailed above, for an inference of scienter to be sufficiently strong "a reasonable person would have to deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (citation modified).

- 27 -

Any argument that the individual defendants possessed the requisite scienter when making the challenged statements presumes that they held a robust understanding of "cooperation," one defined by an inflexible obligation to provide regulators with all requested information on demand. But nowhere does the amended complaint state that Amazon (or iRobot) were under such an obligation. Nor does the amended complaint suggest that the individual defendants understood "cooperation" to mean total and immediate compliance.

To the contrary, Premca alleges that the merger agreement required the parties to use "reasonable best efforts" to obtain regulatory approval and to supply additional information to regulators as promptly as "reasonably practicable." In this context, "reasonable" leaves space for give-and-take between antitrust regulators and merging parties. See Water Island Event-Driven Fund, LLC v. Trib. Media Co., 39 F.4th 402, 406 (7th Cir. 2022) (explaining that phrases using the term "reasonable" connote some flexibility as they "may mean different things to different people"). For example, the FTC acknowledges that merging parties may want to negotiate information requests and invites regulated parties to submit "possible modifications" to such requests. Fed. Trade Comm'n, Requests for Additional Information: Appeal Procedure, [https://perma.cc/59AD-F636] (last visited June 3, 2026). Given this understanding, the individual

defendants likely understood "cooperation" not to require rigid compliance with every regulatory request, but rather to allow for some "hardball" between regulated entities and antitrust authorities. Water Island Event-Driven Fund, LLC, 39 F.4th at 405, 407.

There is nothing in the amended complaint to suggest that iRobot knew Amazon had stopped negotiating with regulators about their information request or were otherwise stonewalling the process when it said that the companies were cooperating. Thus, there are insufficient allegations that iRobot was intentionally or recklessly deceptive when it made the challenged cooperation statements. Premca's argument reduces to a reasonable disagreement over the meaning of "cooperate"; that disagreement does not give rise to a strong inference of scienter.

Premca argues that our decision in Shash v. Biogen, Inc., 84 F.4th 1 (1st Cir. 2023), permits a § 10(b) claim to proceed where a defendant makes "broad statements" despite knowing that they are only partially true. It asserts that the same reasoning applies here because the individual defendants knew that Amazon was uncooperative at least insofar as it had not yet satisfied certain information requests.

In Shash, a pharmaceutical company stated that its "data [were] all consistent" with patients' need for higher doses of a drug for the drug to be effective. 84 F.4th at 11 (emphasis

added).  We allowed a § 10(b) claim to proceed because despite the company's unambiguously absolutist statement, it knew that some of its data suggested otherwise for certain patient groups. Id. at 12-14.

Our case is unlike Shash because there is no plain conflict between the individual defendants' cooperation statements and the information alleged.  The amended complaint asserts only that iRobot knew Amazon had not yet complied with certain information demands.  But, as explained, the individual defendants could reasonably have viewed Amazon as cooperating with regulators even while not fully complying with all information requests.  Thus, unlike Shash, we do not face a situation where the complaint alleges that the individual defendants made a statement despite possessing indisputably contrary information.[9]

### 2.   The August 24, 2023, Modified Proxy Statement

We consider next the allegations derived from the August 24, 2023, modified proxy statement.  The modified proxy statement deserves separate consideration because it is the only statement

---

[9]     Premca also claims that certain statements from the pre-August 24, 2023, period are actionable because iRobot omitted known facts signaling that the merger was suffering diminishing prospects.  As we will discuss, the allegations suggesting the merger was failing occurred after the pre-August 24, 2023, statements.  The only events referenced by Premca during the prior period is Amazon's purported lack of cooperation.  But, as just explained, there are no allegations that Amazon declined to work with regulators.

within the class period where the company affirmatively offered a positive prediction about the outcome of the regulatory review process. Specifically, in this filing, the individual defendants claimed they "expect[ed] that all applicable regulatory approvals [would] be obtained" and that "the merger [would] not violate the antitrust or foreign investment laws." The filing contained caveats, however, that such approvals were not assured.

Because this statement of expectation lacks certainty, it is an opinion. See Carbonite, 22 F.4th at 7. But that does not necessarily shield it from serving as a predicate for § 10(b) liability. Id. For a claim premised on an opinion statement to be viable, the complaint must identify "particular (and material) facts going to the basis for the [defendants'] opinion" such as "knowledge [of information that the defendant possessed] whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 194 (2015). Omitted information is material where "it is substantially likely 'that the disclosure of the omitted . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" Carbonite, 22 F.4th at 8 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).

- 31 -

In Omnicare, the Supreme Court gave an example of an actionable material omission from an opinion statement: If a company opines that it believes its "conduct is lawful," it would be material to omit that the company lawyer has taken the opposite view. 575 U.S. at 188-89. On the other hand, a company offering the same opinion would not have omitted a material fact by withholding the negative view of a junior lawyer where several senior lawyers favor the company's position. Id. at 189-90. That is so because "a reasonable investor does not expect that every fact known to [a speaker] supports its opinion statement." Id. at 190. This example teaches that whether a particular omission is material to a particular opinion statement is a question of degree.

Here, we conclude that the modified proxy statement's prediction of regulatory success crosses the line and qualifies as a misleading statement. It is striking that months after the company refrained from predicting the outcome of the needed regulatory approvals, it did an about face and predicted success. And it did so in the face of a mix of new information indicating that the EC, which had just taken the rare step of elevating the investigation to Phase II, would grant such approval. Crucially, the statement failed to contemporaneously disclose Amazon's ongoing refusal to provide the EC with information about its

- 32 -

search engine. As we now explain, these omissions were sufficiently material to serve as a predicate for a § 10(b) claim.

In the lead-up to the issuance of iRobot's modified proxy statement, its executives, including the individual defendants, were aware of two crucial pieces of information related to Amazon's search engine. The first was public. On July 6, 2023, the EC announced that it would subject the merger to a Phase II investigation, which does not occur in "[t]he vast majority" of EC-reviewed mergers. In its announcement, the EC specified its concerns with the merger, foremost of which was Amazon's potential "ability and incentive to foreclose iRobot's rivals by preventing them from selling [robot vacuums] on Amazon's online marketplace . . .." The EC elaborated that Amazon could favor "iRobot's [vacuums] in both non-paid (i.e., organic) and paid results (i.e., advertisements) displayed in Amazon's marketplace." Thus, the EC had publicly expressed concerns that Amazon would favor iRobot's products over competitors' products in its search engine results.

The second piece of information was private. Premca alleges that during two senior leadership meetings -- one in May 2023, the other in August 2023 -- Weinstein, iRobot's chief legal officer, had warned that Amazon was refusing to provide the EC with "information" about how its "search engine worked," which

would help the EC determine whether Amazon was favoring its internal products to the detriment of competition.[10]

Taken together, these two pieces of information reasonably indicated the merger faced regulatory difficulty. In part motivated by concerns over Amazon's search engine, the EC was taking a rare step of initiating a Phase II investigation. And yet, reading the allegations in the light most favorable to Premca, Amazon had been refusing to provide the EC with information to address this concern for months.

Viewed against that backdrop, the modified proxy statement's optimism could be found to have been materially "misleading" to investors for saying "one thing and holding back another." Omnicare, 575 U.S. at 192. iRobot's rosy prediction of regulatory success, which had not appeared in any public filing since the original proxy statement in September 2022, could reasonably be understood as reassurance to investors as it came

---

[10]    The amended complaint does not provide the exact date on which the August 2023 senior leadership meeting occurred. But it alleges that iRobot's August 8, 2023, Form 8-K filing omitted certain material information, including that iRobot's software engineering department had stopped working on integration meetings with Amazon. We infer from this allegation that the cessation of the integration meetings involving the software engineers occurred before August 8, 2023. And since the amended complaint alleges that the second senior leadership meeting occurred at "the same time" as the stoppage of the integration meetings, we further infer that the second meeting about the search engine also occurred before August 8, 2023.

on the heels of the EC's Phase II announcement. But iRobot did not include information about Amazon's refusal to provide information on the search engine, which was critical to the EC's publicly expressed concerns. Including that information could be found to have "significantly altered the total mix of information" available to investors by undermining iRobot's message of reassurance. Carbonite, 22 F.4th at 8 (quoting Basic, 485 U.S. at 231-32); see Glazer Cap. Mgmt., 63 F.4th at 779 (finding a misleading omission where the defendant publicly expressed optimism that a merger would close without disclosing private information that the counterparty was considering backing out).

The amended complaint also makes sufficient allegations to give rise to a strong inference of scienter. It paints a picture of iRobot as a declining company that was counting on the Amazon merger to improve its financial footing. By August 2023, the merger's success hinged on regulatory approval from antitrust authorities, including the EC. And at this point, the EC's concerns about Amazon's search engine were publicly known. "[T]he importance" to the individual defendants of both the merger and the EC's ability to access Amazon's search engine information leads to the "inference that" the individual defendants were "paying close attention" to those details. Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc., 838 F.3d 76, 82 (1st Cir. 2016) (citation omitted). Based on this inference, we do not

believe that the individual defendants would merely neglect to provide the troubling information about the merger while expressing optimism about it.

Moreover, the amended complaint sufficiently alleges that iRobot knew about Amazon's reluctance to share information regarding its search engine with the EC. Amazon's position was important enough that iRobot's chief legal officer reported twice to its executives, including the individual defendants, that Amazon was not sharing the requested search engine information with the EC. Yet, when predicting regulatory approval, iRobot declined to disclose this material information, thereby issuing a statement when "they knew facts suggesting the statement[] w[as] inaccurate or misleadingly incomplete." Aldridge, 284 F.3d at 83.

Our conclusion is unchanged by iRobot's boilerplate assertions in the modified proxy statement that it could not "assure that [EC] regulatory clearances and approvals [would] be timely obtained [or] obtained at all." Generalized risk disclosures like these do not give a company a "free pass to deceive investors about a specific risk." Charles River, 152 F.4th at 13; see Glazer Cap. Mgmt., 63 F.4th at 779 (holding that boilerplate risk disclosures about hypothetical risks do not cure a misleading statement). Nor do we think that the CMA's approval of the merger lessens the individual defendants' culpable mind.

There is no indication that the individual defendants would have viewed the CMA's approval as abating the EC's concerns about Amazon's search engine or the merger overall. Finally, at oral argument, the defendants contended that the EC's acknowledgment that it had not prejudged the Phase II investigation mitigated their scienter. We disagree. It would be strange if the EC had asserted that it had prejudged the inquiry; a basic reassurance of fairness would not have reasonably assuaged the foreboding facts that iRobot knew -- the EC had taken a rare investigatory step and was concerned about the very information that Amazon was refusing to turn over.

For these reasons, we conclude that Premca has plausibly alleged a § 10(b) claim and a derivative § 20(a) claim based on omissions from the optimistic predictions in the modified proxy statement.[11]

---

[11]     In a footnote, the individual defendants state that the prediction of regulatory approval is a "forward-looking statement . . . accompanied by adequate risk disclosures" and thus is "independently not actionable under the PSLRA's forward-looking safe harbor." This argument is waived because the individual defendants "raise[]" it "only in a footnote" and do so "in a perfunctory manner." Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Cap. LLC, 137 F.4th 6, 24 (1st Cir. 2025) (quoting P.R. Tel. Co. v. San Juan Cable LLC, 874 F.3d 767, 770 (1st Cir. 2017)). They provide no argument in this Court about the adequacy of the risk disclosures in the modified proxy statement.

## 3. The Post-August 24, 2023, Allegations

Finally, we address the statements identified by Premca that post-date the August 24, 2023, modified proxy statement. Unlike the statements made on that day, none of these statements predicted regulatory success. Instead, they provide updates about the ongoing regulatory processes. Premca does not claim that these statements contain affirmative misrepresentations; rather, it asserts that they are misleading because iRobot did not contemporaneously disclose certain other information that, in its view, would have strengthened the view that the merger was likely doomed.

The relevant iRobot statements are: (1) a November 7, 2023, filing in which iRobot reported the FTC's second request for information and materials about the merger, the CMA's unconditional approval of the merger, and the EC's commencement of an "in-depth Phase [II] review," (2) a November 27, 2023, statement reporting that the EC had issued a statement of objections and describing the process for the parties to respond to those objections, and (3) a January 10, 2024, statement by Angle in a *Reuters* article asserting that iRobot continued "to work cooperatively with the [EC] and other regulators in their review of the merger" and that the company "remain[ed] excited about the opportunity to work together with Amazon."

Premca contends that these statements about the regulatory status misled investors because iRobot did not disclose that (1) Amazon had failed to cooperate with government regulators by refusing to provide information about its search engine; (2) in September 2023, iRobot executives had begun to formulate plans for the business without the merger; and (3) by October 2023, Amazon and iRobot had completely stopped holding integration meetings.

Section 10(b) and Rule 10(b)(5) only prohibit omissions that engender "half-truths." Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 263 (2024). The law thus does not impose an "affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011). "An omission, even if material, is actionable only if it 'renders affirmative statements made misleading.'" Zhou, 120 F.4th at 292 (quoting Macquarie Infrastructure, 601 U.S. at 265). Under these standards, the individual defendants were under no obligation to disclose any of the alleged developments.

First, the amended complaint does not allege that Amazon continued to deny the EC's information requests about its search engine after the August 2023 senior leadership meeting. Yet, the statements at issue were made in November 2023, over three months later. Whether or not Amazon had provided the EC with all of the information it had requested, a compromise was apparently worked

- 39 -

out, which permitted the EC to resume the investigation of the merger. Specifically, the complaint alleges that the EC had suspended its investigation deadline so that it could obtain additional information about the merger and that it had restarted its investigation in October 2023, once it had obtained that information. The EC's statement of objections, issued on November 27, 2023, corroborates this inference because it does not identify an inability to obtain necessary information from Amazon as a problem in its review. "[T]he immediate circumstances" around the post-August 2023 statements therefore do not suggest that Amazon was uncooperative with regulators at the operative time, and so iRobot had no obligation to state as much. Zhou, 120 F.4th at 293 (citation omitted).

Second, iRobot was not obliged to disclose that, in September 2023, it had started contingency planning in the event that the merger failed. Based on iRobot's status reports, investors already knew that the FTC had propounded a second request for information and that the EC had launched a Phase II investigation. These are rare events in a merger review, suggesting strong regulatory headwinds. A reasonable investor thus would have known that there was at least a real possibility that the regulators would reject the merger. We do not think that it would have added much to the "mix of information" to disclose, along with its bleak regulatory updates, a notice that it had

started to plan for contingencies.  Carbonite, 22 F.4th at 8.  We add that just because iRobot released certain information about the merger review does not mean that it needed to reveal everything about its internal thinking.  It was "required only to reveal the facts necessary to make the existing statement not 'so incomplete as to mislead.'"  Zhou, 120 F.4th at 294 (quoting Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990)).  Nothing about iRobot's contingency planning makes its regulatory status updates misleading.

The same is true regarding Premca's allegations about the cessation of integration meetings between iRobot and Amazon.  The amended complaint asserts that there were nine work streams participating in these integration meetings between the companies; some of these meetings stopped in August 2023; and all of them ended by October 2023.  The amended complaint, however, provides no well-pleaded allegations for why they ended.

Premca suggests we should infer that these meetings ended because the companies recognized that the merger was going to fail regulatory review.  But that is unsupported by particularized allegations, as required by the PSLRA.  Amazon and iRobot began integration meetings roughly fourteen months before they fully ended.  Toward the end of those fourteen months, the integration meetings ended at different times in the Summer and Fall of 2023, implying that each ended on its own timetable rather

than as the result of a top-down edict related to the status of the regulatory review.  Moreover, Premca's own allegations assert that Amazon, with the likely assistance of iRobot pursuant to the merger agreement, defended the merger in front of the EC in mid-December 2023.  Between the paucity of allegations regarding why the integration meetings ended and iRobot's ongoing efforts to obtain regulatory approval, it would not be proper to infer that iRobot had completely thrown in the towel when it made the challenged statements after August 2023.

In sum, iRobot had no duty to disclose any of the merger developments that the amended complaint identifies following the issuance of the modified proxy statement.  Thus, none of the post-August 2023 statements identified in the amended complaint are actionable under § 10(b).

**IV.**

For the reasons stated, we **reverse** the district court's dismissal of the § 10(b) and § 20(a) claims based on the predictions of regulatory approval contained in the August 2023 modified proxy statement.  We otherwise **affirm** the district court's order.  The case is **remanded** for further proceedings.  No costs are awarded.

**So ordered**.